UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT



**FILED**

MAY 18 2012

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FAIR HOUSING COUNCIL OF SAN
FERNANDO VALLEY and THE FAIR
HOUSING COUNCIL OF SAN DIEGO,

        Plaintiffs - Appellees,

  v.

ROOMMATE.COM, LLC,

        Defendant - Appellant.

No. 09-55272

D.C. No. 2:03-cv-09386-PA-RZ
U.S. District Court for Central
California, Los Angeles

**MANDATE**



RECEIVED
CLERK, U.S. DISTRICT COURT

MAY 1 8 2012

CENTRAL DISTRICT OF CALIFORNIA
BY           DEPUTY

FAIR HOUSING COUNCIL OF SAN
FERNANDO VALLEY and THE FAIR
HOUSING COUNCIL OF SAN DIEGO,

        Plaintiffs - Appellees,

  v.

ROOMMATE.COM, LLC,

        Defendant - Appellant.

No. 09-55875

D.C. No. 2:03-cv-09386-PA-RZ
U.S. District Court for Central
California, Los Angeles

FAIR HOUSING COUNCIL OF SAN
FERNANDO VALLEY; THE FAIR
HOUSING COUNCIL OF SAN DIEGO,

        Plaintiffs - Appellees -

No. 09-55969

D.C. No. 2:03-cv-09386-PA-RZ
U.S. District Court for Central

Cross-Appellants

and

FAIR HOUSING COUNCIL OF SAN
GABRIEL VALLEY,

              Plaintiff

v.

ROOMMATES.COM, LLC,

           Defendant - Appellant -
Cross-Appellee

California, Los Angeles

      The judgment of this Court, entered February 02, 2012, takes effect this date.

      This constitutes the formal mandate of this Court issued pursuant to Rule 41(a) of the Federal Rules of Appellate Procedure.

                            FOR THE COURT:
                            Molly C. Dwyer
                            Clerk of Court

                            Lee-Ann Collins
                            Deputy Clerk

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

FAIR HOUSING COUNCIL OF SAN
FERNANDO VALLEY; THE FAIR
HOUSING COUNCIL OF SAN DIEGO,
*Plaintiffs-Appellees,*

v.

ROOMMATE.COM, LLC,
*Defendant-Appellant.*

No. 09-55272

D.C. No.
2:03-cv-09386-
PA-RZ

FAIR HOUSING COUNCIL OF SAN
FERNANDO VALLEY; THE FAIR
HOUSING COUNCIL OF SAN DIEGO,
*Plaintiffs-Appellees,*

v.

ROOMMATE.COM, LLC,
*Defendant-Appellant.*

No. 09-55875

D.C. No.
2:03-cv-09386-
PA-RZ

973

FAIR HOUSING COUNCIL OF SAN
FERNANDO VALLEY; THE FAIR
HOUSING COUNCIL OF SAN DIEGO,
*Plaintiffs-Appellees-Cross-*
*Appellants,*

and

FAIR HOUSING COUNCIL OF SAN
GABRIEL VALLEY,
*Plaintiff,*

v.

ROOMMATE.COM, LLC,
*Defendant-Appellant-Cross-*
*Appellee.*

No. 09-55969

D.C. No.
2:03-cv-09386-
PA-RZ

OPINION

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted
July 14, 2011—Pasadena, California

Filed February 2, 2012

Before: Alex Kozinski, Chief Judge, Stephen Reinhardt and
Sandra S. Ikuta, Circuit Judges.

Opinion by Chief Judge Kozinski;
Partial Concurrence and Partial Dissent by Judge Ikuta

## COUNSEL

Elizabeth Brancart (argued), Christopher Brancart, Brancart & Brancart, Pescadero, California, for the plaintiff-appellees and cross-appellants.

Timothy L. Alger (argued), Susan B. Estrich, Scott B. Kidman, Christopher E. Price, Quinn Emanuel Urquhart & Hedges, LLP, Los Angeles, California, for the defendant-appellant and cross-appellee.

## OPINION

KOZINSKI, Chief Judge:

There's no place like home. In the privacy of your own home, you can take off your coat, kick off your shoes, let your guard down and be completely yourself. While we usually share our homes only with friends and family, sometimes we need to take in a stranger to help pay the rent. When that happens, can the government limit whom we choose? Specifically, do the anti-discrimination provisions of the Fair Housing Act ("FHA") extend to the selection of roommates?

## FACTS

Roommate.com, LLC ("Roommate") operates an internet-based business that helps roommates find each other. Roommate's website receives over 40,000 visits a day and roughly a million new postings for roommates are created each year. When users sign up, they must create a profile by answering a series of questions about their sex, sexual orientation and whether children will be living with them. An open-ended "Additional Comments" section lets users include information not prompted by the questionnaire. Users are asked to list their preferences for roommate characteristics, including sex, sexual orientation and familial status. Based on the profiles and preferences, Roommate matches users and provides them a list of housing-seekers or available rooms meeting their criteria. Users can also search available listings based on roommate characteristics, including sex, sexual orientation and familial status.

The Fair Housing Councils of San Fernando Valley and San Diego ("FHCs") sued Roommate in federal court, alleging that the website's questions requiring disclosure of sex, sexual orientation and familial status, and its sorting, steering and matching of users based on those characteristics, violate the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 et seq., and

the California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12955.

The district court initially dismissed the claims, holding that Roommate was immune under section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230. We reversed, holding that Roommate was protected by the CDA for publishing the "Additional Comments" section, but not for (1) posting questionnaires that required disclosure of sex, sexual orientation and familial status; (2) limiting the scope of searches by users' preferences on a roommate's sex, sexual orientation and familial status; and (3) a matching system that paired users based on those preferences. *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1166 (9th Cir. 2008) (en banc).

Our opinion was limited to CDA immunity and didn't reach whether the activities, in fact, violated the FHA. On remand, the district court held that Roommate's prompting of discriminatory preferences from users, matching users based on that information and publishing these preferences violated the FHA and FEHA, and enjoined Roommate from those activities. Roommate appeals the grant of summary judgment and permanent injunction, and also the district court's order awarding the FHCs $494,714.40 in attorney's fees. The FHCs cross-appeal the amount of the attorney's fees.

## STANDING

[1] Roommate argues that the FHCs lack standing because they didn't suffer actual injury. We've held that an organization has "direct standing to sue [when] it showed a drain on its resources from both a diversion of its resources and frustration of its mission." *Fair Hous. of Marin* v. *Combs*, 285 F.3d 899, 905 (9th Cir. 2002). However, " 'standing must be established independent of the lawsuit filed by the plaintiff.' " *Comite de Jornaleros de Redondo Beach* v. *City of Redondo Beach*, No. 06-55750, 2011 WL 4336667, at *3 (9th Cir. Sept.

16, 2011) (quoting *Walker* v. *City of Lakewood*, 272 F.3d 1114, 1124 n.3 (9th Cir. 2001)). An organization "cannot manufacture [an] injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." *La Asociacion de Trabajadores de Lake Forest* v. *City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010); *see also Combs*, 285 F.3d at 903 ("[A]n organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit . . . ." (internal quotation marks omitted)).

[2] Prior to commencing litigation, the FHCs investigated Roommate's alleged violations and, in response, started new education and outreach campaigns targeted at discriminatory roommate advertising. The resources spent on those campaigns were not associated with litigation. Because Roommate's conduct caused the FHCs to divert resources independent of litigation costs and frustrated their central mission, we conclude that the FHCs have organizational standing.

## ANALYSIS

If the FHA extends to shared living situations, it's quite clear that what Roommate does amounts to a violation. The pivotal question is whether the FHA applies to roommates.

## I

[3] The FHA prohibits discrimination on the basis of "race, color, religion, sex, familial status, or national origin" in the "sale or rental *of a dwelling*." 42 U.S.C. § 3604(b) (emphasis added). The FHA also makes it illegal to

> make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental *of a dwelling* that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap,

familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

*Id.* § 3604(c) (emphasis added). The reach of the statute turns on the meaning of "dwelling."

**[4]** The FHA defines "dwelling" as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families." *Id.* § 3602(b). A dwelling is thus a living unit designed or intended for occupancy by a family, meaning that it ordinarily has the elements generally associated with a family residence: sleeping spaces, bathroom and kitchen facilities, and common areas, such as living rooms, dens and hallways.

It would be difficult, though not impossible, to divide a single-family house or apartment into separate "dwellings" for purposes of the statute. Is a "dwelling" a bedroom plus a right to access common areas? What if roommates share a bedroom? Could a "dwelling" be a bottom bunk and half an armoire? It makes practical sense to interpret "dwelling" as an independent living unit and stop the FHA at the front door.

There's no indication that Congress intended to interfere with personal relationships *inside* the home. Congress wanted to address the problem of landlords discriminating in the sale and rental of housing, which deprived protected classes of housing opportunities. But a business transaction between a tenant and landlord is quite different from an arrangement between two people sharing the same living space. We seriously doubt Congress meant the FHA to apply to the latter. Consider, for example, the FHA's prohibition against sex discrimination. Could Congress, in the 1960s, really have meant that women must accept men as roommates? Telling women they may not lawfully exclude men from the list of acceptable roommates would be controversial today; it would have been scandalous in the 1960s.

While it's possible to read dwelling to mean sub-parts of a home or an apartment, doing so leads to awkward results. And applying the FHA to the selection of roommates almost certainly leads to results that defy mores prevalent when the statute was passed. Nonetheless, this interpretation is not wholly implausible and we would normally consider adopting it, given that the FHA is a remedial statute that we construe broadly. Therefore, we turn to constitutional concerns, which provide strong countervailing considerations.

## II

[5] The Supreme Court has recognized that "the freedom to enter into and carry on certain intimate or private relationships is a fundamental element of liberty protected by the Bill of Rights." *Bd. of Dirs. of Rotary Int'l* v. *Rotary Club of Duarte*, 481 U.S. 537, 545 (1987). "[C]hoices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." *Roberts* v. *U.S. Jaycees*, 468 U.S. 609, 617-18 (1984). Courts have extended the right of intimate association to marriage, child bearing, child rearing and cohabitation with relatives. *Id.* While the right protects only "highly personal relationships," *IDK, Inc.* v. *Clark Cnty.*, 836 F.2d 1185, 1193 (9th Cir. 1988) (quoting *Roberts*, 468 U.S. at 618), the right isn't restricted exclusively to family, *Bd. of Dirs. of Rotary Int'l*, 481 U.S. at 545. The right to association also implies a right *not* to associate. *Roberts*, 428 U.S. at 623.

[6] To determine whether a particular relationship is protected by the right to intimate association we look to "size, purpose, selectivity, and whether others are excluded from critical aspects of the relationship." *Bd. of Dirs. of Rotary Int'l*, 481 U.S. at 546. The roommate relationship easily qualifies: People generally have very few roommates; they are selective in choosing roommates; and non-roommates are

excluded from the critical aspects of the relationship, such as using the living spaces. Aside from immediate family or a romantic partner, it's hard to imagine a relationship more intimate than that between roommates, who share living rooms, dining rooms, kitchens, bathrooms, even bedrooms.

[7] Because of a roommate's unfettered access to the home, choosing a roommate implicates significant privacy and safety considerations. The home is the center of our private lives. Roommates note our comings and goings, observe whom we bring back at night, hear what songs we sing in the shower, see us in various stages of undress and learn intimate details most of us prefer to keep private. Roommates also have access to our physical belongings and to our person. As the Supreme Court recognized, "[w]e are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings." *Minnesota* v. *Olson*, 495 U.S. 91, 99 (1990). Taking on a roommate means giving him full access to the space where we are most vulnerable.

Equally important, we are fully exposed to a roommate's belongings, activities, habits, proclivities and way of life. This could include matter we find offensive (pornography, religious materials, political propaganda); dangerous (tobacco, drugs, firearms); annoying (jazz, perfume, frequent overnight visitors, furry pets); habits that are incompatible with our lifestyle (early risers, messy cooks, bathroom hogs, clothing borrowers). When you invite others to share your living quarters, you risk becoming a suspect in whatever illegal activities they engage in.

[8] Government regulation of an individual's ability to pick a roommate thus intrudes into the home, which "is entitled to special protection as the center of the private lives of our people." *Minnesota* v. *Carter*, 525 U.S. 83, 99 (1998) (Kennedy, J., concurring). "Liberty protects the person from unwarranted government intrusions into a dwelling or other private places. In our tradition the State is not omnipresent in

the home." *Lawrence* v. *Texas*, 539 U.S. 558, 562 (2003). Holding that the FHA applies inside a home or apartment would allow the government to restrict our ability to choose roommates compatible with our lifestyles. This would be a serious invasion of privacy, autonomy and security.

For example, women will often look for female roommates because of modesty or security concerns. As roommates often share bathrooms and common areas, a girl may not want to walk around in her towel in front of a boy. She might also worry about unwanted sexual advances or becoming romantically involved with someone she must count on to pay the rent.

An orthodox Jew may want a roommate with similar beliefs and dietary restrictions, so he won't have to worry about finding honey-baked ham in the refrigerator next to the potato latkes. Non-Jewish roommates may not understand or faithfully follow all of the culinary rules, like the use of different silverware for dairy and meat products, or the prohibition against warming non-kosher food in a kosher microwave. Taking away the ability to choose roommates with similar dietary restrictions and religious convictions will substantially burden the observant Jew's ability to live his life and practice his religion faithfully. The same is true of individuals of other faiths that call for dietary restrictions or rituals inside the home.

The U.S. Department of Housing and Urban Development recently dismissed a complaint against a young woman for advertising, "I am looking for a female christian roommate," on her church bulletin board. In its Determination of No Reasonable Cause, HUD explained that "in light of the facts provided and after assessing the unique context of the advertisement and the roommate relationship involved . . . the Department defers to Constitutional considerations in reaching its conclusions." *Fair Hous. Ctr. of W. Mich.* v. *Tricia,*

No. 05-10-1738-8 (Oct. 28, 2010) (Determination of No Reasonable Cause).

**[9]** It's a "well-established principle that statutes will be interpreted to avoid constitutional difficulties." *Frisby* v. *Schultz*, 487 U.S. 474, 483 (1988). "[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Pub. Citizen* v. *U.S. Dep't of Justice*, 491 U.S. 440, 466 (1989) (internal quotation marks omitted). Because the FHA can reasonably be read either to include or exclude shared living arrangements, we can and must choose the construction that avoids raising constitutional concerns. *See INS* v. *St. Cyr*, 533 U.S. 289, 299-300 (2001) ("[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is fairly possible, we are obligated to construe the statute to avoid such problems.") (internal citation and quotations marks omitted). Reading "dwelling" to mean an independent housing unit is a fair interpretation of the text and consistent with congressional intent. Because the construction of "dwelling" to include shared living units raises substantial constitutional concerns, we adopt the narrower construction that excludes roommate selection from the reach of the FHA.

### III

**[10]** Because we find that the FHA doesn't apply to the sharing of living units, it follows that it's not unlawful to discriminate in selecting a roommate. As the underlying conduct is not unlawful, Roommate's facilitation of discriminatory roommate searches does not violate the FHA. While Roommate itself has no intimate association right, it is entitled to raise the constitutional claims of its users. *See Craig* v. *Boren*, 429 U.S. 190, 195 (1976). The injunction entered by the district court precludes Roommate's members from selecting

roommates unfettered by government regulation. Roommate
may therefore raise these claims on their behalf.

## IV

[11] The same constitutional concerns over the right to
intimate association would arise if the California Fair
Employment and Housing Act ("FEHA") were applied to
roommates. Accordingly, we interpret "housing accommoda-
tion" in section 12955(c) of the FEHA to exclude the sharing
of living units. Similarly to how the FHA defines "dwelling,"
the FEHA defines "housing accommodation" as "any build-
ing, structure, or portion thereof that is occupied as, or
intended for occupancy as, a residence by one or more fami-
lies." Cal. Gov. Code § 12927(d). This ambiguous definition
allows us to apply the canon of constitutional avoidance to
find that the FEHA does not reach the selection of room-
mates.

In a 1995 amendment, the FEHA carved out from the defi-
nition of discrimination "the use of words stating or tending
to imply that the housing being advertised is available only to
persons of one sex," "[w]here the sharing of living areas in a
single dwelling unit is involved." Cal. Gov. Code
§ 12927(c)(2)(B). The concurrence infers from this 1995
exemption that the statute as passed in 1974 must have cov-
ered roommates. But the acts of a subsequent legislature tell
us nothing definitive about the meaning of laws adopted by an
earlier legislature. *See Pension Benefit Guar. Corp.* v. *LTV
Corp.*, 496 U.S. 633, 650 (1990) ("[S]ubsequent legislative
history is a hazardous basis for inferring the intent of an ear-
lier Congress." (internal quotation marks omitted)); *see also
Sullivan* v. *Finkelstein*, 496 U.S. 617, 632 (1990) (Scalia, J.,
concurring) ("Arguments based on subsequent legislative his-
tory . . . should not be taken seriously, not even in a foot-
note."). The 1995 legislature may have been uncertain about
whether the statute, as passed decades earlier, covered room-
mates, and wanted to remove any doubt that roommates could

select each other by sex. But the amendment can shed no light on the meaning of "housing accommodation" in the FEHA, a statutory phrase it does not modify or reference.

[12] Nothing in the language of the statute provides that a "housing accommodation" includes shared living quarters. Under the canon of constitutional avoidance, the interpretation of the statute need not be the best reading, so long as it's "fairly possible." *St. Cyr*, 533 U.S. at 299-300. It is "fairly possible" that the statute does not apply to roommates. Interpreting it as excluding roommates avoids a ruling on a difficult and unexplored constitutional issue.

The concurrence also relies on a FEHC decision, but the FEHC had no authority to address the underlying constitutional problems raised by the FEHA, and thus had no reason to consider the constitutional avoidance canon: "Whether it is sound policy to ban discrimination in the selection of roommates, and whether such a policy implicates constitutional rights of privacy or association, are not questions for this decision to resolve. Those are issues for the Legislature and the courts, respectively, to decide." *Dep't of Fair Emp't & Hous.* v. *Larrick*, FEHC Dec. No. 98-12, 1998 WL 750901, at *5 n.1 (July 22, 1998). We, on the other hand, have a duty to consider constitutional concerns and to adopt an interpretation that avoids ruling on the constitutionality of a statute, if we can fairly do so. *See St. Cyr*, 533 U.S. at 299-300. We are as capable as the district court in resolving the issue, which we review de novo in any event. Therefore, we see no need to remand this question to the district court.

* * *

[13] Because precluding individuals from selecting roommates based on their sex, sexual orientation and familial status raises substantial constitutional concerns, we interpret the FHA and FEHA as not applying to the sharing of living units. Therefore, we hold that Roommate's prompting, sorting and

publishing of information to facilitate roommate selection is not forbidden by the FHA or FEHA. Accordingly, we vacate the district court's judgment and remand for entry of judgment for defendant. Because the FHCs are no longer prevailing, we vacate the district court's order for attorney's fees and dismiss the cross-appeals on attorney's fees as moot.

## VACATED AND REMANDED IN PART; DISMISSED IN PART

IKUTA, Circuit Judge, concurring and dissenting:

I concur in the majority's holding that the Fair Housing Act (FHA) does not apply to the sharing of living units. I write separately, however, to express my concern that our circuit's test for organizational standing cannot be reconciled with Supreme Court precedent. Further, I respectfully dissent from Part IV of the majority decision, which applies its FHA analysis to the California Fair Employment and Housing Act (FEHA) claim of the two Fair Housing Councils.

### I

In order to assert standing as an organization, rather than on behalf of their members,[1] the Fair Housing Councils must show they suffered an injury in fact, just as if they were individuals. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982). In other words, each Fair Housing Council

---

[1] If either of the Fair Housing Councils had asserted standing on behalf of its members, it would need to show that its "[1] members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). But here, the Fair Housing Councils assert only organizational standing.

must show that Roommates' actions caused it to suffer "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted).[2] To meet this requirement, the Fair Housing Councils must show that Roommates' conduct "perceptibly impair[s]" the organizations' interest in carrying out their core missions. *Havens*, 455 U.S. at 378-79.

Fair Housing Councils of San Fernando Valley and San Diego are non-profit organizations with the shared core mission of eliminating housing discrimination in their communities. They accomplish this mission through, among other things, investigation, education, and outreach regarding instances of housing discrimination. In response to their discovery of Roommate's allegedly discriminatory housing advertisements, the Fair Housing Councils spent money on investigation, education, and outreach regarding the trend of housing discrimination on the Internet.

So far so good: two organizations dedicated to combating housing discrimination have spent money combating housing discrimination. But according to the Fair Housing Councils and our precedent, these organizations were "injured" for standing purposes by the very expenses that advanced their mission. This raises a question that threatens to bring us loggerheads with *Lujan*: How can an organization have a legally protected interest in *not* spending money to advance its core mission?

A

The answer to this question is embedded in an illogical and erroneous development in our case law. We have correctly

---

[2]There also must be a causal connection between the injury and the defendant's conduct, and the injury must be redressable by a favorable decision. *Id.* at 560-61.

recognized that organizations have standing to sue on their own behalf when a defendant's actions impair the organization's ability to function as an organization. An action that invades an organization's interest in recruiting members, obtaining funding, or collecting dues clearly hinders that organization's ability to function, and is an injury for purposes of standing. *See, e.g., Am. Fed'n. of Gov't Emps. Local 1 v. Stone*, 502 F.3d 1027, 1033 (9th Cir. 2007) ("[A]n increased difficulty in recruiting union members qualifies as a 'concrete and demonstrable' injury"); *Walker v. City of Lakewood*, 272 F.3d 1114, 1124-25 (9th Cir. 2001) (holding that an organization was injured by, among other things, delayed contractual payments and government client's non-renewal of the contract); *Constr. Indus. Ass'n of Sonoma Cty. v. City of Petaluma*, 522 F.2d 897, 903 (9th Cir. 1975) (holding that a restrictive building plan injured an association of builders "in a very real sense" because it decreased construction and consequently, membership dues for the association).

The Supreme Court has also held that an organization's ability to function as an organization is impaired if its purpose is to provide a specified type of service and a defendant's actions hinder the organization from providing that core service. *Havens*, 455 U.S. at 378-79. In *Havens*, a fair housing organization alleged that its mission was to "assist equal access to housing through counseling and other referral services." *Id.* at 379. The organization asserted that the defendant's discriminatory housing practices frustrated the organization's ability to "provide counseling and referral services for low- and moderate-income homeseekers." *Id.* The Court held that this allegation was sufficient for standing because it represented a "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organizations's resources—[that was] far more than simply a setback to the organization's abstract social interests." *Id.*

Based on this language in *Havens*, we developed a two-prong test: an organization can establish an injury if it can

show "(1) frustration of its organizational mission; and (2) diversion of its resources to combat the [challenged actions]." *Smith v. Pac. Prop. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004). While our articulation of the test is consistent with *Havens*, our application of it has drifted away from the requirement that an organization actually suffer an injury.

In *Smith*, for example, we considered whether an organization dedicated to "eliminat[ing] discrimination against individuals with disabilities by ensuring compliance with [accessibility] laws" had standing to sue a real estate developer who constructed properties with alleged design and construction defects that violated those laws. *Id.* at 1105. We held that because the organization's ultimate goal was to eliminate discrimination against individuals with disabilities, "[a]ny violation" of the relevant accessibility law constituted a frustration of the organization's mission. *Id.*; *see also Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) (holding that an organization's mission of promoting equal housing opportunities, as required by the FHA, was frustrated by the defendant's alleged FHA violations). We further held that the organization met the "diversion of resources" prong because the money it spent "in order to monitor the violations" diverted resources "from other efforts to promote awareness of—and compliance with—federal and state accessibility laws." *Smith*, 358 F.3d at 1105. Yet no allegations were made that this allocation of resources harmed the organization in any way. *Id.* Rather, all that our precedent required for diversion was that the organization spent resources that it "otherwise would spend in other ways." *El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Review*, 959 F.2d 742, 748 (9th Cir. 1991).

Thus, we have held that an organization with a social interest in advancing enforcement of a law was injured when the organization spent money enforcing that law. This looks suspiciously like a harm that is simply "a setback to the organization's abstract social interests," the very thing *Havens*

indicated was not a "concrete and demonstrable injury to the organization's activities." *Havens*, 455 U.S. at 379; *see also Sierra Club v. Morton*, 405 U.S. 727, 738-39 (1972) (holding that an organization's abstract interest in a problem, without direct harm, is insufficient to establish standing). After all, an organization created to advance enforcement of a law is not hampered in its mission because the law is violated: absent violations, the organization would have to find a new mission. Furthermore, the organization has no legally protected interest in keeping its budget allocation constant, especially in the face of new opportunities to advance its mission. New organizational undertakings by definition divert resources but, as shown below, nothing about such diversion is per se harmful. *Smith*'s ruling to the contrary is in tension with the Supreme Court's requirement that an organization actually suffer a "concrete and particularized injury." *Lujan*, 504 U.S. at 560.

## B

This case brings the strain between our case law and Supreme Court precedent close to a rupture.

As noted above, the Fair Housing Councils have the mission of eliminating unlawful housing discrimination, in part through investigation, education and outreach. Before bringing this litigation, the organizations purposely decided to advance their mission by focusing on discrimination in online housing advertisements, such as those allegedly contained on Roommate's site. Pursuant to this intentional allocation of resources, both Fair Housing Councils spent time investigating Roommate's website to find specific instances of discrimination. Further, Fair Housing Council San Diego hosted a conference "on the topic of the Internet and fair housing" and "conducted approximately 49 outreach presentations" on the subject. Fair Housing Council of San Fernando Valley "sent an education letter and fair housing packet to sixty-four (64) media and advertising sources with explicit mention of the fair housing concerns with advertising listings in the elec-

tronic form," along with "devot[ing] more time to the problem of discriminatory rental listings" in its training seminars. In short, the Fair Housing Councils spent money investigating and addressing the exact problem they were established to address, housing discrimination, in the exact way they planned to address such problems, education and outreach.

If anything, their newfound topical focus on Internet housing advertisements reflected the Fair Housing Councils' considered judgments of how they could *best* accomplish their goals in the face of changing client needs created by new technology. As they acknowledged, the Internet was a "new frontier" of housing discrimination. In response to this "trend" and the "sheer numbers" of housing discrimination issues raised by websites like Roommate's, the Fair Housing Councils made Internet advertising a "major focus of [their] outreach efforts." Therefore, the alleged "diversion" here was a voluntary redirection of more resources to areas where there were more housing problems and where the Fair Housing Councils could make a bigger impact advancing their missions. This represents adaptive and savvy organizational management, not injury. *See Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1277 (D.C. Cir. 1994) ("One can hardly say that BMC [an allegedly discriminatory employer] has injured the Council merely because the Council has decided that its money would be better spent by testing BMC than by counseling or researching.").

Given this record, it is clear that Roommates' activities did not cause the Fair Housing Councils to incur an injury-in-fact that meets the *Lujan* standard. The Fair Housing Councils suffered no invasion of their organizational interest in obtaining funding, collecting dues or recruiting members; nor were they hampered from advancing their mission. In holding otherwise, we are faithful to our precedent, but unfaithful to *Lujan*.

Where Supreme Court precedent is contrary to our precedent, we are the ones that have to change. *Cf. Atonio v. Wards*

*Cove Packing Co., Inc.*, 810 F.2d 1477, 1478-79 (9th Cir. 1987). I suggest that it is time we revisited our circuit's test en banc.

## II

In addition to my concern about our standing inquiry, I must respectfully dissent from the majority's decision to "apply the canon of constitutional avoidance to find that FEHA does not reach the selection of roommates." Maj. Op. at 986. The interpretive canon of constitutional avoidance directs that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems." *Edward J. DeBartolo Corp. v. Fl. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). But this interpretive tool can be used only when a statute is ambiguous. It does not give federal courts the power to "rewrite a state law to conform it to constitutional requirements." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988).

In this case, FEHA's language and its application by the California agency tasked with interpreting it suggest that FEHA is "unambiguous on the point under consideration here." *See Salinas v. United States*, 522 U.S. 52, 60 (1997). FEHA expressly defines "discrimination" as not including "the use of words stating or tending to imply that the housing being advertised is available only to persons of one sex," in a situation "[w]here the sharing of living areas in a single dwelling unit is involved." Cal. Gov. Code § 12927(c)(2)(B). This language is not in the FHA. Because a statute's "mention of [one example] implies the exclusion of others not mentioned," *United Dominion Indus., Inc. v. United States*, 532 U.S. 822, 836 (2001), FEHA's definition of "discrimination" in § 12927(c)(2)(B) expresses the state legislature's intent to exempt sex-specific advertisements for shared living units in a single dwelling from the restrictions of FEHA, but not

constitutionality of FEHA's applicability to such shared living arrangements is both novel and difficult. Given that neither the Fair Housing Councils nor Roommate addressed this issue in their briefs, I would remand this issue to allow the district court to hear from the parties and rule on this issue in the first instance. Therefore, I respectfully dissent from Part IV of the opinion.